UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

DEC - 9 2003

BY DAVID J. MALAND, CLERK
DEPUTY_____

| | |
|---|---|
| KENNETH LUKE, individually and on behalf of himself and all others similarly situated, | : |
| Plaintiff, | : |
| vs. | : |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY and LINCOLN FINANCIAL DISTRIBUTORS, INC., | : |
| Defendants. | : |

5 0 3 C V  2 5 6

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS

Plaintiff, by his attorneys, makes the following allegations in support of his Class Action Complaint for Violations of Securities Laws. The allegations with respect to plaintiff's acts are based upon his own knowledge. Other allegations are based upon facts obtained through an investigation undertaken by plaintiff's counsel. Plaintiff believes that further substantial evidentiary support will exist for his allegations after a reasonable opportunity for discovery, especially in view of the fact that much of the evidence supporting the allegations contained in this complaint is within the exclusive control of defendants.

### NATURE OF THE ACTION

1. Plaintiff brings this action as a class action under the Securities Exchange Act of 1934 (Exchange Act) individually and on behalf of a Class consisting of:

> All persons who purchased an individual variable deferred annuity contract or a certificate to a group variable deferred annuity contract issued by The Lincoln National Life Insurance Company, or who made an additional investment in a separate account investment option under such a contract, between December 10, 1998 and the present, which contract was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

The covered retirement plans include traditional IRAs, rollover IRAs, Roth IRAs, 401(k) plans, 403(b) arrangements, and others.  Plaintiff is a member of the Class.

2.      Under the Internal Revenue Code, insurance products, including variable annuities, are exempt from income taxation on their inside investment build-up (earnings).  The main economic value of a deferred annuity is to act as a wealth accumulation device that confers tax advantages, including tax deferral of earnings and the ability to switch among different investment accounts inside the annuity without triggering current taxation.  However, for persons funding retirement plans (for example, 401(k) plans and IRAs), these tax advantages are unnecessary because, under the Internal Revenue Code, such retirement plans are already automatically tax deferred (also referred to as "tax-qualified") regardless of the investments placed in the plans.

3.      As set forth in detail below, defendants nevertheless target sales of variable annuities to persons seeking to fund tax-qualified retirement plans.  In recommending these sales, defendants uniformly omitted to disclose to prospective purchasers that the main economic value of such annuities (tax deferral) is unnecessary for them, as qualified plan investors.  Defendants also uniformly failed to disclose that a variable annuity is a suitable investment only when an insurance need supports the recommendation.  As a result, plaintiff and the other members of the Class have suffered, and continue to suffer, economic injuries as a result of paying fees and other detriments, including surrender penalties, associated with the insurance aspects of these products – which plaintiff and the class would not have agreed to pay if defendants had made full and fair disclosure of the facts omitted as alleged herein.

4.      The Lincoln National Life Insurance Company ("Lincoln National") is an Indiana domiciled insurance company and, for purposes of distributing securities, a broker-dealer member of NASD Regulation, Inc. (NASDR).  Lincoln Financial Distributors, Inc. ("LFD") is a wholly-

owned subsidiary of Lincoln National and performs, on an agency basis, marketing support services on behalf of Lincoln National in the sale of its variable annuities.

5.      Plaintiff and the class had no reason to suspect that insurance companies command high fees for insurance and impose the other detriments associated with variable annuities because of the valuable tax advantages of the product – tax advantages that plaintiff and the class would already automatically enjoy regardless of whether they funded their qualified plan with a deferred annuity.

6.      Defendants' conduct is contrary to minimum industry standards for financial service providers. For example, in May 1999, NASDR issued a reminder to its members, including Lincoln National, that they must fulfill their duties of fair dealing when selling variable annuities, including having adequate supervisory procedures in place to ensure that selling agents have performed a product suitability analysis to ascertain whether the product's tax and insurance features meet the customer's needs. NASDR also reminded its members that when recommending a variable annuity for funding a tax-qualified retirement plan, a sales agent has an affirmative duty to disclose to the prospective purchaser that "the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary." *See* NASD Notice to Members 99-35, *The NASD Reminds Members of Their Responsibilities Regarding the Sales of Variable Annuities* (May 1999) (NASDR NTM 99-35).

7.      In selling variable annuities through agents that have not made adequate disclosures and suitability determinations, as described above, defendants have violated their duties under the Exchange Act not to omit material information in connection with the sale of securities, and not to make sales without performing an appropriate suitability analysis.

8.      As set forth in detail below, class members who were sold variable annuities to fund their qualified plans have suffered severe economic harm over time. By retirement age, insurance

fees and other detriments of variable annuities (described more fully below) cause the loss of up to one-third of a retirement investor's account value, as compared to straight investment products such as mutual funds. Moreover, once consumers purchase a variable annuity, they are trapped for many years because high surrender fees inhibit them from exiting the arrangement.

9.     Defendants' violations of the Exchange Act have been intentional. The insurance and surrender fees charged to annuity owners (which are in addition to investment management fees and contract administration fees) yield much greater income to defendants than would be realized from the sale of straight mutual funds providing the same investment options. This greater income provides additional profits to defendants and additional compensation to the selling agents – who receive commissions two to ten times higher on variable annuity sales as compared to sales of mutual funds. Defendants and their sales agents failed to make meaningful disclosures and proper suitability determinations because they know that a fully informed qualified retirement plan purchaser will reject the notion that a variable annuity for funding a qualified plan is in the best interest of the investor.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this district under 28 U.S.C. § 1391 because the wrongs alleged in this complaint occurred, in substantial part, in this District. Specifically, materially deceptive sales tactics and omissions occurred in this District; and defendants' variable annuities are advertised, marketed and sold in this District.

12.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone and data communications, in connection with the acts and conduct alleged herein.

## PARTIES

### A.     Plaintiff

13.     Plaintiff Kenneth Luke is a citizen and resident of the State of Texas.  Mr. Luke received advice from Paul Hinton in making retirement plan arrangements.  Hinton obtained detailed knowledge of Mr. Luke's financial affairs.  In December 1998, Hinton recommended to Mr. Luke that he transfer his profit sharing plan to a 403(b) plan funded by a Lincoln National variable annuity.  On information and belief, Hinton was a duly appointed insurance agent of The Lincoln National Life Insurance Company, as well as a securities registered representative.  On December 16, 1998, Lincoln National issued Mr. Luke a variable deferred annuity (contract number 96-9431583).  No insurance need was identified in the sale.  Mr. Luke was not told, and the documents provided in the sale did not state, that the tax deferral feature of a variable annuity is unnecessary for qualified plan investors.  Five years later, Mr. Luke learned from his new financial advisors that insurance companies command high insurance fees, high surrender penalties and other detriments of the variable annuity product because of the valuable tax advantages of the product, which are unnecessary for qualified plan investors.  Had these material facts been communicated to him in the sale, Mr. Luke would not have agreed to the recommendation by Lincoln National's sales agent.  Mr. Luke has been damaged by paying a premium for a tax shelter investment, given that he was investing dollars inside a qualified retirement plan that is tax sheltered regardless of the investment funding the plan.  Mr. Luke has an illiquid investment that is draining his retirement assets with unnecessary insurance fees.  Meanwhile, Lincoln National and its sales agent made substantially more money than they could have made selling mutual funds.

### B.     Defendants

14.     Lincoln National is an Indiana domiciled insurance company that sells variable annuities through appointed sales agents.

15.   LFD is a Connecticut corporation and a wholly-owned subsidiary of Lincoln National. Lincoln National and LFD enter into selling agreements with affiliated and unaffiliated broker-dealers under which these broker-dealers, and their associated registered representatives, act on an agency basis for Lincoln National and LFD in the solicitation and sale of variable annuities. In addition, the registered representatives selling Lincoln National variable annuities are appointed by Lincoln National with state insurance departments to act as agents on Lincoln National's behalf in the solicitation and sale of variable annuities.

## DEFENDANTS' WRONGFUL CONDUCT

### A.   The Structure of Lincoln National's Variable Annuities

16.   Deferred annuities are a different product than traditional annuities.  In the traditional sense, an annuity is the reverse of life insurance.  Life insurance pools the risk of a premature death, while a traditional annuity pools the risk of living too long.  When a consumer purchases a traditional annuity, the consumer typically acquires, in exchange for an up-front premium payment, the right to a stream of periodic payments from the insurer that is guaranteed to continue for as long as the annuitant is alive.  This type of annuity can provide comfort and protection for persons who are afraid that they may outlive their assets.  To find the best deal, consumers can shop for an annuity that provides the highest benefits in comparison with the premium paid in, also taking into consideration the fact that the financial strength of the issuing life insurance company is the sole basis of its payment guarantee.  This traditional annuity is a product sold by the insurance industry known as an "immediate annuity" (payout annuity) because annuity payments to the contract owner (or purchaser) begin immediately after she tenders the premium to the insurer.

17.   In contrast to an immediate annuity, a deferred annuity – the type of annuity at issue in this complaint – is an accumulation product.  As a leading authority has commented:

It is important to keep in mind that there are two different products called "annuities" offered by the insurance industry, and they have very little in common.  The first

> such product, the deferred annuity, is basically an investment vehicle. Deferred
> annuities . . . have settlement options which provide a periodic income, but the
> settlement options are most often not elected and almost never play an important part
> in the purchase or selection of a particular deferred annuity.

Albert E. Easton and Timothy F. Harris, Actuarial Aspects of Individual Life Insurance and Annuity

Contracts (ACTEX Publications 1999) at 20. With a deferred annuity, the purchaser invests money

and intends the value of the account to grow (depending on the performance of the investment

vehicle that is chosen) prior to using the accumulated account assets during retirement.

   a.   *Fixed and variable deferred annuities.* Within a deferred annuity, there are a

limited number of investment options. In fixed accounts funding a deferred annuity, the purchaser

receives from the insurer an interest rate on the amount of premiums paid into the product by the

purchaser; the insurer may contractually agree to a particular rate for a period of time, but more

typically the insurer adjusts the rate at its discretion. In variable accounts funding a deferred

annuity, the purchaser receives "units" representing interests in one or more "subaccounts" of a

separate account sponsored by the insurer, containing equity, bond or money market portfolios,

which are usually managed by outside investment managers (and can be managed and named so as

to mimic well-known "brand name" mutual funds offered by those managers, even though they are

different investments and may have a somewhat different performance record). A deferred annuity

with both fixed and variable accounts is called a combination deferred annuity.[1]

---

[1] Variable annuities are a hybrid insurance and investment product. The securities component
consists of units of interest in a separate account that are registered as securities under the Securities
Act of 1933 (unless exempted by Section 3(a)(2) in the case of certain separate account interests
issued in connection with certain group plans). The separate account, as the issuer of the separate
account interests, is registered as an investment company under the Investment Company Act of
1940 (ICA). The insurance components of variable annuities consist of an annuity insurance
contract issued by a state-regulated insurance company, and interests in one or more fixed accounts
that invest in the general account of a state-regulated insurance company. An insurance company
issuing variable annuities avoids ICA regulation by relying on the "insurance company" exemption
from the definition of an investment company provided at Section 3(c)(3) in the ICA.

   b. *Deferred annuities are tax shelters.*  A deferred annuity is an instrument, as is a qualified retirement plan, set up to obtain special tax benefits for investors.  Tax deferral on earnings in a deferred annuity is provided by the Internal Revenue Code (26 U.S.C. § 72) and allows the purchaser to accumulate greater wealth for retirement.

   c. *Annuitization of a deferred annuity is the purchase of a payout annuity.*  At a date selected by the owner, withdrawals can be made from a deferred annuity.  The owner may take an immediate lump sum or a periodic withdrawal plan of some or all of his investment.  Or, as another payout option, he may "annuitize," which is essentially the purchase of a payout annuity.  Under current tax law, the tax deferral advantage of the product is present regardless of whether the account balance is ever actually converted into a payout annuity.

   d. *A payout annuity option is available to anyone.*  A payout annuity can be purchased with some or all of the money in any retirement account, regardless of the investment funding the plan.  It is not necessary to buy a deferred annuity in order to be able to obtain a payout annuity income stream.

  18. Variable annuities typically contain two insurance features: specified minimum annuity purchase rates for the annuity payout options, and a "death benefit" that contractually provides that if the account owner dies during the investment period, his or her heirs receive some defined amount (for example, the principal amount invested) even if the investment has crashed at that time.

  19. However, the life insurance industry's own experts have conceded that the value of these insurance features of a deferred variable annuity is so nominal that informed consumers would not choose to buy the product in the absence of a tax deferral benefit.  Michael Lane, president of AEGON Financial Services Group, reportedly reminded his colleagues of the reality that the "death benefit feature is a waste" for buyers because, of the contract holders who die, the number "actually

benefitting from the death benefit [is] statistically irrelevant." *National Underwriter-Life/Health* at 15 (Feb. 22, 1999).

20.     According to independent, peer-reviewed scholarship, the insurance charges in a variable annuity are not accounted for by the actuarial value of the insurance, but instead are properly viewed as "an implicit payment for the tax-deferral privilege" of the product. *See* Milevsky & Posner, "The Titanic Option: Valuation of the Guaranteed Minimum Death Benefit in Variable Annuities and Mutual Funds, 68 J. OF RISK AND INS. 93 (2001). Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people who have long-term investment objectives and for whom tax deferral is beneficial (although studies show that it takes several decades before the benefits of tax deferral begin to outweigh the drag of the annuity's higher fees). Thus, deferred annuities are marketed by scrupulous companies as being potentially appropriate retirement investments only for individuals who have already made their maximum contributions to IRAs, 401(k)s or other qualified plans available to them, and are looking for an additional tax-deferred retirement investment vehicle.

21.     On the other hand, as financial experts who are not biased by an affiliation with a variable annuity seller have consistently concluded, variable annuities are ***not*** appropriate for tax-qualified retirement plans. Scrupulous sellers of variable annuities (including many of the nation's largest annuity sellers, such as Fidelity, Vanguard and Charles Schwab) refrain from marketing or selling deferred variable annuities for placement in qualified plans, and prominently disclose in sales materials that the product is not appropriate for persons who have not already fully funded their qualified plans.

22.     This conclusion has been confirmed by the SEC. In its first-ever consumer brochure addressing the sale of annuities, issued in June 2000, the SEC described the type of deception complained about by plaintiff in this action, and then *warned that the product provides unnecessary*

*tax advantages and is generally not suitable for qualified plan investors.* "For most investors, it will be advantageous to make the maximum allowable contributions to IRAs and 401(k) plans before investing in a variable annuity."

### B. Regulation of Deferred Annuities

23. The variable annuities sold by defendants contain various components with different characteristics. The separate account, which contains subaccounts that each hold a portfolio of equities or bonds or other investments, is federally regulated as an investment company, and (if no exemption applies) the interests in the separate account available under the variable annuity contract are registered as securities and sold pursuant to federal securities law requirements.

24. The sale of variable annuities at issue in this case also involves the issuance of an individual insurance contract, or issuance of an individual certificate to a group annuity, directly between Lincoln National, the plaintiff and class members. These insurance contracts are regulated as insurance. Lincoln National's variable annuities also contain one or more fixed accounts, also regulated as insurance, which provide contract owners with interests in the general account of Lincoln National.

### C. Defendants' Control of the Sales Process

25. Lincoln National's relationship with its sales agents is one in which the agents are the functionaries of Lincoln National in inducing sales of deferred annuity contracts (unlike, for example, the situation with issuers of stocks, bonds and mutual funds vis-a-vis stockbrokers, between whom there typically is no such relationship).

26. State insurance law requirements also impose a non-delegable duty on life insurers, such as Lincoln National, to supervise sales of their variable annuities. Pursuant to regulatory requirements, Lincoln National prepares or pre-approves each piece of advertising and sales material used to effect sales of its deferred annuities. Agents are forbidden to use any sales material

in the promotion of Lincoln National products that has not been approved by Lincoln National. Each annuity application is forwarded to Lincoln National, which easily ascertains from information on the application whether the deferred annuity will be used to fund a qualified plan. Lincoln National has sole authority to determine whether to issue the contract for that particular purpose.

27.     Lincoln National and LFD are responsible for ensuring that broker/dealers contracted to sell their products on an agency basis are in compliance with state insurance and federal securities laws applicable to these products, and that sales practices conform to the NASDR Conduct Rules.

28.     In selling variable annuities, defendants train their agents to target people who are looking to fund qualified retirement plans. Defendants and their agents particularly seek out persons, such as plaintiff, who have large amounts in corporate retirement plans that need a rollover IRA to preserve the tax-deferred status of the money. Defendants promote the high commissions of variable annuities to their agents compared to mutual funds, but omit any training on the necessity to disclose to the customer that the tax advantages of variable annuities are unnecessary and that a suitability determination requires the finding that an insurance need is met by the product.

29.     By virtue of the fact that sales agents are acting within the scope of their agency relationship with defendants in selling defendants' deferred annuities for qualified plans, the deficiencies in the manner in which these sales are affected are the responsibility of and imputed to defendants as principals. In addition, the deceptive sales practices at issue in this complaint are directly conceived, orchestrated, ratified and affirmed by the defendants, as described above.

### D.     Defendants Intentionally Target Qualified Plan Investors for Selling Variable Annuity Sales Without Making the Required Disclosures

30.     Marketplace competition has dramatically reduced the sales compensation (commissions) paid to intermediaries for sales of mutual funds and many other financial products. By contrast, the commissions paid for sales of deferred annuities are now among the highest

available in the market, and are typically two to ten times higher than the prevailing commission rate for mutual funds. Moreover, deferred annuities are one of the last remaining tax shelters available to the public. As a result of these factors, deferred annuities have grown in recent years from relative obscurity to the largest business segment of the United States life insurance industry. Sales of variable deferred annuities soared to a reported $111.1 billion in calendar year 2002, compared to $4.6 billion in 1987. There is nearly $800 billion of U.S. retirement savings now invested in variable annuities.

31.     Meanwhile, the retirement investment market in the United States has undergone a revolution over the last two decades. Instead of guaranteed lifetime pension benefits calculated based on retirees' life expectancies, modern contributory retirement plans – including IRAs, 401(k)s and 403(b)s – now predominate. Contributory plans require participants to manage their own retirement investments. The goal is to maximize asset accumulation for retirement. Investment growth on a tax-deferred basis, accordingly, has become a key consideration. Retirement plans are the largest assets owned by many households (larger than home equity), yet most individuals are not well-equipped to deal with the complex considerations involved in effectively managing these assets.

32.     The sales transactions at issue in this complaint (particularly those involving funds reinvested into rollover IRAs) are in many instances the single most financially consequential decision many persons will make in their lifetimes. Given the simultaneous growth in recent years of tax-deferred investments (e.g., deferred annuities) and tax-deferred contributory retirement savings plans, many people are unaware of the potential for financial injury and are easily confused by trusted advisors who recommend variable annuities for funding qualified plans. Defendants have willfully capitalized on this point of confusion to induce and profit from sales of deferred annuities to persons who do not benefit from them. Defendants target their sales efforts to market

segments containing persons who are typically not sophisticated about retirement investments. For example, defendants' sales materials include explanations of basic terms and seek to introduce investors to basic concepts like tax deferral, explaining why it would be of value to have tax deferral as part of a retirement savings plan. Scrupulous marketers of deferred annuities devote prominent portions of their advertising and sales materials to inform consumers that a deferred annuity should not be considered until after consumers have fully funded their qualified plans.

### E.   Defendants' Disclosure Duties

33.    Defendants had a duty to disclose to prospective purchasers of Lincoln National variable annuities for placement in qualified retirement plans that the main economic benefit of the product, tax deferral, was unnecessary in their situation, and that such annuities could be a suitable investment only when a specific insurance need supports the purchase. An insurance need is unlikely to be met by the product because the death benefit feature of a variable annuity is an inefficient method of purchasing life insurance. Unlike life insurance, which pays a tax-free death benefit, any death benefit paid on a variable annuity in excess of tax basis is taxable to heirs.

34.    Defendants' disclosure duty is based on federal laws and regulations requiring full and fair disclosure in the sale of securities, NASD Conduct Rules, which impose a duty of fair dealing, and state laws and regulations including unfair insurance trade practices statutes.

35.    Compliance with the NASD Conduct Rules is mandated by the federal securities laws. 15 U.S.C. § 78o(b)(8). In an interpretation of the duty of fair dealing imposed by the Conduct Rules, the NASDR stated in NASDR NTM 99-35 that "when a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary." The sales practice guidelines therein constitute a

broad consensus of the industry itself. *See, e.g.,* NASDR NTM 99-35 (99-35 is intended to "represent a compilation of industry practices in the supervision of the sale of variable annuities"). In subsequent enforcement actions against variable annuity sellers, the NASDR has stated that NTM 99-35 "was intended to remind firms of their responsibilities" and that adequate supervisory procedures were expected to be in place prior to the issuance of NTM 99-35, to ensure that material disclosures were being made to qualified plan investors and that suitability review systems were working.

36.    At a speech at the National Association for Variable Annuities (NAVA) Regulatory Affairs Conference on June 28, 1999, Paul Roye, the SEC's Director of the Division of Investment Management, stated:

> Whether a life insurance company has a captive or independent sales force, or distributes its products through intermediaries, controls must be in place to prevent sales practice abuses to the greatest extent possible.
>
> *     *     *
>
> Effective internal controls to prevent, detect, and correct misleading or abusive sales practices are essential.

The SEC staff has also stated that "during inspections they will scrutinize insurers to make sure they are conducting a suitability review."

37.    The unfair insurance trade practices statutes enacted in each of the 50 states requires fair dealing in the sale of insurance products, including full disclosure of material information in connection with the sale of variable annuities.

### F.    Defendants' Material Omissions

38.    Defendants and their agents sell deferred variable annuity contracts by failing to disclose material facts to plaintiff and the members of the Class or their employers.

39.    In each transaction at issue, defendants and their agents make a recommendation of a variable annuity to fund a qualified plan. Defendants fail to explain that the tax deferral feature of a

variable annuity is unnecessary, and fail to disclose that a variable annuity is a suitable investment only when an insurance need supports the recommendation. This information is required to be disclosed in order to prevent the affirmative recommendation of the variable annuity from being materially misleading.

40. These material omissions are also uniformly omitted from agent training and education materials, prospectuses, and consumer brochures prepared and distributed by defendants.

41. Defendants know that variable annuities are only potentially appropriate for customers in certain circumstances, but fail to act to ensure that its sales agents are making full disclosures and have reasonable grounds for believing that their recommendations are suitable.

**G.     Defendants' Concerted Activity as Joint Conspirators**

42. Advertising, sales presentation and other materials used in connection with the sale of defendants' insurance products to the public, including computer software used to generate such materials, are developed, approved and disseminated by all defendants.

43. Other joint activities of the defendants include interacting with the general public through common facilities, including the same customer service support centers and their shared Internet web sites at www.lfg.com.

## CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. As stated above, the Class consists of:

> All persons who purchased an individual variable deferred annuity contract or a certificate to a group variable deferred annuity contract issued by The Lincoln National Life Insurance Company, or who made an additional investment in a separate account investment option under such a contract, between December 10, 1998 and the present, which contract was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

Excluded from the Class are defendants, defendants' officers and directors, those persons' immediate families, and the successors and predecessors of any such excluded person or entity.

45.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is not known to plaintiff at this time, purchasers of defendants' variable annuity contracts are believed to number in the thousands, and are widely dispersed geographically. Class members may be identified from the records maintained by defendants and may be notified of the pendency of this action using a form of notice and dissemination methods similar to those customarily used in other class actions.

46.     Plaintiff's claims are typical of the claims of the other members of the Class. Defendants made the same material omissions in selling their variable annuities to plaintiff and the members of the Class. Plaintiff and the members of the Class suffered the same type of harm resulting from defendants' wrongful conduct complained of herein.

47.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action securities litigation.

48.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually seek redress for the wrongful conduct complained of herein.

49.     Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

50.     Common questions of law and fact predominate over any questions affecting individual members of the Class. The common questions include, among others:

(a) whether defendants and their agents omitted the disclosures concerning tax deferral and insurance need suitability described in this complaint in connection with sales of variable annuities to Class members;

(b) whether those omissions were material;

(c) whether defendants and their agents acted with knowledge or reckless disregard of the truth;

(d) whether those omissions caused injury to the members of the Class, and what is the appropriate measure of damages;

(e) whether defendants were controlling persons under Section 20(a) of the Exchange Act;

(f) whether Lincoln National's contracts are void pursuant to Section 29(b) of the Exchange Act;

(g) whether rescission and restitution of contract insurance charges are available remedies to members of the Class; and

(h) whether injunctive relief in the form of waivers of surrender penalties or other equitable relief is appropriate.

## COUNT ONE

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.    A unit of interest in a separate account funding a variable deferred annuity is a security subject to the Exchange Act, including Section 10(b) and Rule 10b-5 promulgated thereunder, because the units of interest possess characteristics that are similar to those of investment securities.

53.     Defendants and their agents employed devices, schemes or artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and the Class in connection with the purchase and sale of securities.  Defendants failed to disclose that the tax deferral feature of a variable annuity is unnecessary for qualified plan investors, and that any permissible investment funding the qualified plan will enjoy the tax benefits automatically provided by the qualified plan.  Defendants failed to disclose that an insurance need must be found to have been met by the product to justify the suitability of the product for funding a qualified plan.

54.     These material omissions deceived and misled plaintiff and the other members of the Class.  Had plaintiff and the other members of the Class known the truth, they would not have purchased Lincoln National's variable annuity contracts.  As a result of the deception, plaintiff and the other members of the Class were damaged by paying a premium for a tax shelter investment without realizing the tax advantages of the product.

55.     Defendants' omissions were made with scienter, as described in this complaint.

56.     Plaintiff and the members of the Class were damaged thereby.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     By reason of defendants' control of their sales agents, as well as their own culpable participation, defendants are controlling persons within the meaning of Section 20(a) of the Exchange Act.

59.     By reason of defendants' control of LFD and the broker/dealers who have entered into agency selling agreements, and their associated registered representatives, as well as their own

culpable participation, defendants are controlling persons within the meaning of Section 20(a) of the Exchange Act.

## COUNT THREE

### Violation of Section 29(b) of the Exchange Act Against All Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     A unit of interest in a separate account funding a variable deferred annuity is a security subject to the Exchange Act, because the units of interest possess characteristics that are similar to those of investment securities.

62.     Defendants issued securities to plaintiff and members of the Class on or after December 10, 1998 through material omissions in violation of Section 10(b) of the Exchange Act.

63.     Plaintiff and the members of the Class are entitled to elect to void their contracts with Lincoln National pursuant to Section 29(b) of the Exchange Act because the contracts were made in violation of, and performance involves violations of, the Exchange Act, and to obtain appropriate restitution, including waiver or return of surrender penalties, and all other fees, charges, revenue, profits and/or unjust enrichment obtained by Lincoln National through the business of selling and issuing variable contracts to plaintiff and Class members in violation of the Exchange Act.

WHEREFORE, plaintiff, on behalf of himself and the Class, pray for relief and judgment as follows:

a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure.

b.      Determining that statutory relief pursuant to Section 29(b) is available to plaintiff and the Class members because Lincoln National's making and performance of contracts with plaintiff and the Class members involves violations of the Exchange Act, and that such contracts are voidable and unenforceable at the election of plaintiff and each member of the Class;

c.      Awarding restitution of all contract charges paid by plaintiff and the members of the Class to Lincoln National, including pre-judgment interest, and enjoining the imposition of any contract surrender penalties;

d.      Disgorgement of unjust enrichment, including revenues received through violations of the Exchange Act;

e.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants for all damages sustained as a result of defendants' wrongdoing, in amounts to be proven at trial, including pre-judgment interest thereon;

f.      Awarding injunctive or other equitable relief in favor of plaintiff and the other Class members;

g.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

h.      Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  December 9, 2003

PATTON, HALTOM, ROBERTS,
McWILLIAMS & GREER, LLP

George McWilliams
Richard A. Adams
Century Plaza, Suite 400
2900 St. Michael Drive
P.O. Box 6128

Texarkana, Texas  75505-6128
(903) 334-7000

NIX, PATTERSON & ROACH, L.L.P.
Jeffrey  J. Angelovich
Bradley E. Beckworth
205 Linda Drive
P.O. Box 679
Daingerfield, Texas  75638
(903) 645-7333

MILBERG WEISS BERSHAD HYNES
  & LERACH LLP
Michael C. Spencer
Janine L Pollack
Lee A. Weiss
Brian C. Kerr
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

UITZ & ASSOCIATES
Ronald A. Uitz
1717 K St., N.W., Suite 600
Washington, DC  20036
(202) 296-5280

THE LUSTIGMAN FIRM, P.C.
Andrew B. Lustigman
149 Madison Avenue, Suite 805
New York, New York  10016
(212) 683-9180

*Attorneys for Plaintiff*

## CERTIFICATION OF KENNETH LUKE
## IN SUPPORT OF CLASS ACTION COMPLAINT

Kenneth Luke ("plaintiff") declares, as to the claims asserted under federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above captioned case, and authorizes its filing.

2.    Plaintiff did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff made the following transactions in Lincoln National Life Insurance Company:  See Attached Schedule A.

5.    In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class action filed under federal securities law.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of December, 2003.

_____
Kenneth Luke

## SCHEDULE A

On December 16, 1998, plaintiff Kenneth Luke purchased a Lincoln National variable deferred annuity (contract no. 96-9431583), and thereafter purchased additional units of interest in a separate account funding the contract.